UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Criminal No. 14-105 (RHK/FLN) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Ali Omer Ahmed, | |
| Defendant. | |

Katharine Buzicky, Assistant United States Attorney, for Plaintiff.
Shannon Elkins, Assistant Federal Defender, for Defendant.

**THIS MATTER** came before the undersigned United States Magistrate Judge on June 11, 2014 on the Defendant's motion to suppress statements (ECF No. 24). On July 2, 2014, Ahmed submitted a post-hearing memorandum in support of his motion. ECF No. 38. The Government submitted a post-hearing opposition memorandum on July 8, 2014. ECF No. 39. This matter was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1 For the reasons set forth below, the Court recommends the Defendant's motion be **GRANTED.**

## I.   FINDINGS OF FACT

### A.   Background

Ali Omer Ahmed is a middle-aged man of Ethiopian origin. Tr. of First Interview, Def. Ex. 1 at 36. Ahmed's primary language is Oromo and he is not fluent in English. *Id.* at 1. During the fall of 2013, Ali Omer Ahmed was working at the North Country Lodge in Minneapolis, Minnesota. Def.'s Mem. in Supp. of Mot. to Suppress 1, ECF No. 38. On September 5, 2013 he was confronted

1

by his boss with an accusation that he made inappropriate sexual advances toward K.B., a female air-force officer who was staying at the Lodge. *Id.* at 1; Hearing Tr. 61-64, ECF No. 92. In response to the allegation, Ahmed wrote a statement. Def. Ex. 2. The statement is written in broken English, but reads "I was stocking my cart and the guest came out from Rm 118 and ask me to [service her room] [sic] I finish the [sic] and she tap me on the shoulder and say thank you." *Id.* Ahmed was informed that the matter would be referred to the Air Force Office of Special Investigation (AFOSI). ECF No. 38 at 2. The following day, AFOSI special agents arrived at the Lodge toward the end of Ahmed's shift to question him about the incident. *See generally*, ECF No. 92, 44-81. Nearly two months later, Ahmed was interviewed for a second time by different AFOSI agents. *Id.* at 18-37. The second interview took place in Ahmed's home on November 13, 2013. *Id.*

**B. Testimony of Special Agent Shane Sailer.**

Agent Sailer is an AFOSI agent based at the Grand Forks Air Force Base in North Dakota. ECF No. 92 at 44. He testified on behalf of the Government. In the fall of 2013, he was on a temporary duty assignment investigating another matter in Minneapolis when he was asked to investigate K.B.'s alleged sexual assault. *Id.* at 46. Initially, it was reported to Sailer that while Ahmed was cleaning K.B.'s room, he motioned for her to hug him, he tried to kiss her and that he touched her buttocks. *Id.* at 46, 67. On September 6, 2013, the day after the alleged incident, Sailer and another agent went to the North Country Lodge to interview Ahmed. *Id.* at 47. Sailer testified that he informed Ahmed that his participation in the interview was voluntary and that he was free to leave at any time. *Id.* at 48, 51. Ahmed agreed to speak with the agents. *Id.* The Agents did not read Ahmed his *Miranda* rights. *Id.* at 77.

The agents were informed that Ahmed was not fluent in English, so they asked a woman who

2

works with Ahmed who also speaks Oromo to translate. *Id.* The co-worker was not a professional translator and Sailer acknowledged that she asked for clarification about the meaning of what the agents were saying several times. *Id.* at 57. At one point, Ahmed requested a translator who spoke perfect English. *Id.* at 78; Def. Ex. 1 at 52. The interview was video recorded and later transcribed by a professional Oromo translator, which reveals numerous translation errors. *Id.* at 49 and 61. Gov Ex. 1 and Def. Ex. 1.

For example, at the beginning of the interrogation Officer Sailer stated "[y]our presence here or you being here is completely voluntary and you can leave at any time." *Id.* at 2. This was translated as "[y]ou coming here and helping us out with these questions here, if you want to leave you free to leave." *Id.* A few minutes later Agent Sailer stated that they would get started while Nabia (the co-worker / translator) was there but that Ahmed should "let us know if you wanna leave but I just want to get your side of the story . . . ." *Id.* at 3. This was translated as "Ok we will start while Nabhia is here and now we will get started." *Id.* The agents attempt to inform Ahmed of the voluntary nature of his first written statement was translated as follows:

> Officer 2: Ok, let him know what I'm getting ready to read, I need him to understand.
> Interpreter: I am going to read to you and I want you to understand what I am reading.
>
> Officer 2: I hereby
> Interpreter: I heard
>
> Officer 2: Voluntarily
> Interpreter: Voluntarily, you know
>
> Officer 2: And of my own free will
> Interpreter: On my part in a very easy way
>
> Officer 2: Make this statement
> Interpreter: The writing you wrote

3

>Officer 2: Without being
>Interpreter: Without anything in it
>
>Officer 2: Subjected to any coercion, tricks, no tricks
>Interpreter: That here is no trick in here
>
>Officer 2: Or unlawful influence
>Interpreter: Ok, can you say it again?
>
>Officer 1: Persuasion, unlawful like not legal, persuasion
>Interpreter: Something that is not right.

*Id.* at 46. At one point the interpreter admitted that "I'm not good English too." Def. Ex. 1. at 51. Ahmed said, "[y]ou are not understanding what they are saying to you and I am not understanding what you are saying to me . . . ." *Id.* The interpreter responded that "[t]hey can find someone else for you." *Id.*

In the interview room, Ahmed was placed farthest from the door because the video equipment was located above the door and the agents wanted to make sure that the recording captured the image of Ahmed. *Id.* at 50. The interview room door was propped open with a door stop. *Id.* During the course of the nearly three hour interview, Ahmed did not indicate that he wanted to stop speaking with the agents, nor did he request a lawyer. *Id.* However, at the end of the interview, Ahmed asked for clarification about whether he could go home or if he was under arrest and going to jail. *Id.* at 84.

During the course of the interview, Ahmed wrote two statements in Oromo that were later translated into English. *Id.* 54-55. *See* Gov. Ex. 2 and 3. Ahmed's first written statement was taken approximately one hour and 11 minutes into the interview. Tr. 72, ECF No. 37. The statement reads "I cleaned room number 118 and left. While I was going out she pat me on the shoulder and said thank you very much. I also touched her by my hand and then left." Gov. Ex. 2 and 2A. Later,

4

Ahmed refused to sign the statement because he "did not understand it." ECF No. 37 at 77. Thereafter, Sailer and his colleagues accused Ahmed of lying. *Id.* at 82. The agents requested that he consent to giving a DNA sample and they also told him that there was a web camera in K.B.'s room that recorded his interaction with K.B. *Id.* at 79. During his testimony, Sailer acknowledged that the agents knew there was no web camera in the room. *Id.* at 80.

The agents also raised Ahmed's previous criminal history, including an instance of domestic abuse involving his wife and an alleged incident where Ahmed picked up a girl from a bar to have sex with her. *Id.* at 81 and 52-53. After about one hour and 45 minutes into the interview, the agents took a break and Ahmed wrote a second statement. *Id.* at 101. The statement reads "Because I did 118 good, she kissed me and I kissed her, too. We kissed and went apart. She said I love you and I said I love you too." Gov. Ex. 3A. At the end of the interview, Ahmed went home and the agents told him they might be in touch to ask some follow-up questions with a professional translator. *Id.* at 104.

      **C.**    **Testimony of Special Agent Andrew Cox.**

Andrew Cox, an AFOSI Special Agent, also testified on behalf of the government in regard to his investigation of K.B.'s alleged sexual assault. *Id.* at 18. Cox conducted a second interview with Ahmed in his apartment. *Id.* Cox testified that he tried to reach Ahmed by phone several times, but that Ahmed failed to return his phone calls. *Id.* at 19. On November 13, 2013, Cox and Special Agent Leonard Meadows went to Ahmed's apartment. *Id.* The apartment manager took the special agents to Ahmed's apartment and knocked on the door. *Id.* at 20. Ahmed answered the door and invited the agents inside. *Id.* There was a woman in the apartment with Ahmed. *Id.*

Cox and Meadows were wearing plain clothes. *Id.* Both were armed, but their weapons were

5

concealed. *Id.* at 21. Cox testified that the beginning of his conversation with Ahmed was conversational, even "friendly." *Id.* Cox did not inform Ahmed of his *Miranda* rights. *Id.* The agents did not tell Ahmed that he was prohibited from speaking with the woman in the apartment, nor did they restrict his movement or forbid him from making phone calls. *Id.* at 23 and 40.

Cox testified that he was aware of Ahmed's broken English, so he arranged for an Oromo interpreter to translate for him telephonically. *Id.* at 24. Cox called the interpreter, Halima Adan, after approximately ten minutes of conversation with Ahmed. *Id.* Prior to calling the interpreter, Cox informed Ahmed that he was investigating the K.B. incident and that he felt the previous investigators "did not get the whole truth last time." *Id.* at 25. Cox recalled Ahmed "shaking his head and saying yeah." *Id.* at 25-26. After Cox called the interpreter, he made introductions and asked Ahmed to tell him more about the K.B. incident. *Id.* at 26. Ahmed insisted that he already told the whole truth during the first interview. *Id.* Cox insisted he did not have the whole story. *Id.* at 27. At this point, Ahmed became more defensive and insisted that he was innocent. *Id.* Ahmed did not ask Cox to leave or request to speak to an attorney. *Id.*

Cox told Ahmed that his DNA was in K.B.'s vagina, but that the investigators did not know if he had sexual intercourse with K.B. or if he only digitally penetrated her. *Id.* at 28-29. In response, Ahmed admitted that he penetrated K.B. with one finger. *Id.* at 30. Cox then asked Ahmed to write a statement about his encounter with K.B. *Id.* at 30-32. See Gov. Ex. 4A. The statement reads "Room18. She and I agreed, we kissed. She warmed me up by her hand. I inserted my hand, too. We both did it for each other but not me alone." *Id.* A *Miranda* warning, written in English, appears on the front of the form where Ahmed wrote his statement confessing to digitally penetrating K.B. *Id.* at 40. The *Miranda* warning was not read or translated to Ahmed. *Id.* On cross examination, Cox

acknowledged that the airforce had no DNA evidence and that his statement to Ahmed in that regard was false. *Id.* at 37.

### D. Testimony of Halima Adan.

Halima Adan testified on behalf of the government about interpretation services she provided to AFOSI Special Agent Andrew Cox. *Id.* at 4. Adan lives in Atlanta, Georgia and provides telephonic interpretation services on behalf of Language Services Associates in several languages, including Oromo. *Id.* Adan provided interpretation services for Air Force Special Agent Cox on November 13, 2013. *Id.* at 6. Adan recalled that the interpretation that day went smoothly. She stated "if it doesn't go smoothly, I go back to the special agent whom I'm interpreting for, and then I go back to the client, and then I clarify before I interpret." *Id.* at 7. Adan also testified that Ahmed did not indicate that he had difficulty understanding her when she translated for him on November 13, 2013. *Id.* at 15.

## II. ANALYSIS

Ahmed moves to suppress all statements, admissions and answers that he made on September 6, 2013 and November 13, 2013. ECF No. 38 at 1. Ahmed contends that he was not properly informed of the voluntary nature of the interviews and thus his Fifth Amendment rights were violated. *Id.* The Government maintains that Ahmed was informed that the interviews were voluntary and that he was not in custody. For the reasons discussed below, the Court concludes that Ahmed was in custody during both interviews and should have been informed of his *Miranda* rights.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." In *Miranda v. Arizona,* the Supreme Court concluded that four specific *Miranda* warnings are necessary prior to custodial interrogation to "assure that the

individual's right to choose between silence and speech remain unfettered throughout the interrogation process." *Miranda v. Arizona*, 384 U.S. 436, 469 (1966).[1] However, *Miranda* protections are only triggered when a defendant is both in custody and being interrogated. *United States v. Hatten*, 68 F.3d 257, 261 (8th Cir. 1995). In this case, the Government does not dispute that the AFSOI agents' interviews of Ahmed constituted interrogations. *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) ("[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police know are reasonably likely to elicit an incriminating response from the suspect."). The question that remains is whether Ahmed was in custody.

A defendant is "in custody" when he is either formally arrested or restrained to a degree comparable to a formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125 (1983). "To determine whether a defendant was in custody for Miranda purposes, a court looks to the totality of the circumstances confronting the defendant at the time of the interview, and asks whether a reasonable person in his position would consider his freedom of movement restricted to the degree associated with formal arrest." *United States v. Huether*, 673 F.3d 789, 794 (8th Cir. 2012) (quotations omitted). In *United States v. Griffin*, the Eighth Circuit identified the following six indicia of custody:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest;
>
> (2) whether the suspect possessed unrestrained freedom of movement during

---

[1]   The four warnings include (1) you have the right to remain silent; (2) anything you say can and will be used against you in a court of law; (3) you have the right to an attorney; and (4) if you cannot afford an attorney, one will be provided for you. *Miranda*, 384 U.S. at 478-79.

questioning;

(3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;

(4) whether strong arm tactics or deceptive stratagems were employed during questioning;

(5) whether the atmosphere of questioning was police dominated; or

(6) whether the suspect was placed under arrest at the termination of the questioning.

922 F.2d 1343, 1343 (8th Cir. 1990). In this case, consideration of these six factors weigh in favor of concluding that Ahmed was in custody during the September and November interviews. Because Ahmed was not informed of his rights prior to the interviews, all written statements and other admissions and answers should be suppressed.

### A. The September 6, 2013 interview.

The September interrogation of Ahmed was marked by inaccurate translations by Ahmed's coworker and by coersive tactics utilized by Special Agent Sailer and his partner. *See generally*, Def. Ex. 1. In regard to the first *Griffin* factor (whether Ahmed was informed of the voluntary nature of the interview), none of the translations made regarding the voluntariness of the interrogation were entirely accurate. At the beginning of the interrogation Officer Sailer stated "[y]our presence here or you being here is completely voluntary and you can leave at any time." *Id.* at 2. This was translated as "[y]ou coming here and helping us out with these questions here, if you want to leave you free to leave." *Id.* A few minutes later Agent Sailer stated that they would get started while Nabia (the co-worker / translator) was there but that Ahmed should "let us know if you wanna leave but I just want to get your side of the story . . . ." *Id.* at 3. This was translated as "[o]k we will start while Nabhia is here and now we will get started." *Id.* The agents' attempt to inform Ahmed of the

9

voluntary nature of his written statements was equally misleading. *Id.* at 46. As noted above, the interpreter translated "I hereby" as "I heard"; "and of my own free will" as "on my part in a very easy way" and "unlawful influence" as "something that is not right." *Id.* at 46. In the end, Ahmed refused to sign the first statement he wrote because he "did not understand." *Id.* at 50.

In further support of Ahmed's confusion about whether the interrogation was voluntary, at the end of the interrogation he asked "[W]hat happens now? Do I go to jail or go home?" *Id.* at 103. Officer 1 replied "[y]ou are going home. You are here voluntarily. You can leave whenever. We are not going to arrest you anything like that." *Id.* at 104. This was interpreted as "[b]ecause you are here voluntarily and you respectfully came you are going home." *Id.* In sum, the first *Griffin* factor weighs slightly in favor of Ahmed because, although the Special Agents told him the interrogation was voluntary, that sentiment was not accurately translated and Ahmed clearly did not understand the non-custodial nature of the interrogation as evidenced by his question about whether he was going to jail at the end of the interview.

The second *Griffin* factor (whether the suspect had unrestrained movement) also weighs in favor of Ahmed because he was placed on the far side of the room, away from the door. Although the door was open, it was only propped open by a door stop. During the one break taken during the nearly three hour interview, Ahmed was escorted to the bathroom and Agent Sailer testified that he was kept within "eye shot." ECF No. 37 at 82. For all of these reasons, Ahmed did not have unrestrained freedom of movement during the first interrogation.

The third *Griffin* factor (whether suspect sought out law enforcement or whether the suspect agreed to respond to questions) weighs equally in favor of the Government and Ahmed. Ahmed did not seek out law enforcement, but he did agree to speak with the AFOSI special agents.

The fourth *Griffin* factor (whether strong arm tactics were used) weighs strongly in favor of Ahmed. Special Agent Sailer and his partner utilized the following strong-arm tactics: (1) they asked Ahmed to take a DNA sample but did not actually collect one; (2) they asked Ahmed to take a lie detector test; (3) they told him that there was a camera in the room that recorded his interaction with K.B. when they knew there was no such recording; (4) they raised Ahmed's prior criminal history, including a domestic violence allegation made by his wife; and (5) they accused Ahmed of previously picking up a girl in a bar to have sex with her. *Id.* at 16, 17, 27, 42 and 52-53. All of these tactics were deployed in order to pressure Ahmed to incriminate himself.

It is true that some degree of coercion is a normal aspect of all police interrogations. *United States v. LeBrun*, 363 F.3d 715, 721 (8th Cir. 2004) ("[S]ome degree of coercion is part and parcel of the interrogation process and . . . the coercive aspects of a police interview are largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart."). The totality of the circumstances in this case makes the tactics used by Agent Sailer and his partner ones that a reasonable person would perceive as restricting his or her freedom. Critical to the Court's conclusion in this case is that it should have been clear to the agents that Ahmed was not clearly understanding his co-worker's translation. At one point the interpreter herself admitted said "I'm not good English too." Def. Ex. 1. At 51. Ahmed said "[y]ou are not understanding what they are saying to you and I am not understanding what you are saying to me . . . ." *Id.* The interpreter responded "[t]hey can find someone else for you." This significant language barrier coupled with deceptive strong-arm tactics would make a reasonable person with Ahmed's English language abilities feel that they were not permitted to leave the room. Again, this conclusion is supported by the Ahmed's question of whether he could go home or if he

was going to jail at the conclusion of the interrogation.

The fifth *Griffin* factor (whether the interview was police dominated) weighs slightly in favor of Ahmed. Although the interpreter was present during the interrogation, there were two Special Agents present for the entire questioning. Finally, the sixth *Griffin* factor weighs in favor of the Government because Ahmed was not arrested after the interrogation.

Because four of the sixth *Griffin* factor weigh in favor of Ahmed, the Court concludes that he was in custody during the nearly three hour interrogation completed by Agent Sailer and his partner. Ahmed should have been informed of his *Miranda* rights prior to commencement of the interview through a professional translator. Because the agents failed to inform Ahmed of his rights under the Fifth Amendment, all statements, answers and admissions from the first interview should be suppressed.

        **B.**     **The November 13, 2013 interview.**

The November 2013 interrogation of Ahmed by Agent Cox also constitutes an in custody interview under the *Griffin* factors. Because there is no official record of Agent Cox's interview of Ahmed, the Court must rely on Agent Cox's sworn testimony. *See generally*, ECF No. 37, 18-42. The first *Griffin* factor (whether the suspect was informed of the voluntary nature of the questioning) weighs heavily in favor of Ahmed. Cox testified that he did not tell Ahmed that he was prohibited from speaking to the woman in the apartment or that he was forbidden from making a phone call. ECF No. 37 at 23. At no point did Ahmed request to speak to an attorney. *Id.* at 27. However, absent from Cox's testimony is any indication that he informed Ahmed that the interview was voluntary. Based on Cox's testimony, he failed to specifically inform Ahmed of the voluntary nature of the interview both when he spoke with Ahmed directly and when he utilized the services of the

telephonic translator. *Id.* at 25-27.

The second *Griffin* factor (whether the suspect's movement was unrestrained) weighs in favor of the Government. Although it is not clear that Ahmed understood he could leave or ask Agent Cox to leave, he was not restricted from moving in and around his apartment. ECF No. 37, 18-42. The third *Griffin* indicia of custody (whether suspect sought out law enforcement or whether the suspect agreed to respond to questions) weighs equally in favor of the Government and Ahmed. Ahmed did not seek out law enforcement, but he did allow the AFOSI agents into his apartment and agreed to speak with them. *Id.*

The fourth *Griffin* factor (whether strong arm tactics were used) weighs in favor of Ahmed. Agent Cox told Ahmed that he believed Ahmed was still not telling the full truth and that law enforcement found Ahmed's DNA in K.B.'s vagina. ECF No. 37 at 28. During Agent Cox's testimony, he acknowledged that this was a lie. *Id.* at 37. Cox specifically told Ahmed that they did not know if Ahmed had sexual intercourse with K.B. or if he only digitally penetrated her. *Id.* 28-29. This led to Ahmed signing a statement confessing to digitally penetrating K.B. Gov. Ex. 4A. The deceptive tactic used by Agent Cox, considered in light of the fact that a woman (presumably Ahmed's wife) was in the apartment during the interrogation, leads the Court to view the fourth Griffin factor in favor of Ahmed.

The fifth *Griffin* factor (whether the interview was police dominated) weighs equally in favor of Ahmed and the Government. There were two special agents that showed up at Ahmed's door, but there was another woman in the apartment with Ahmed. Finally, the sixth *Griffin* indicia of custody weighs in favor of the Government because Ahmed was not arrested after the interrogation.

Here the *Griffin* factors are evenly split in favor of Ahmed the Government. However,

because Agent Cox did not testify that he affirmatively informed Ahmed of the voluntary nature of the November 13, 2013 interrogation, the Court views the totality of the circumstances in favor of Ahmed. Because Ahmed was not informed of the voluntary nature of the interview and in light of the deceptive tactics used by Agent Cox, the Court concludes that Ahmed was in custody. Ahmed should have been informed of his *Miranda* rights. Because he was not, all answers, statements and admissions should be suppressed.

### III. RECOMMENDATION

Based upon the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Ahmed's motion to suppress statements, answers and admissions (ECF No. 24 ) should be **GRANTED**.


DATED: August 13, 2014                          *s/Franklin L. Noel*
                                                FRANKLIN L. NOEL
                                                United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **August 27, 2014**, written objections that specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **August 27, 2014,** a complete transcript of the hearing.